Good morning, Mr. Sussman. You are observed two minutes for rebuttal. You can begin whenever you're ready. The appellant established on motion for summary judgment that there had been a long period of disparate discipline. I heard the interference, so I moved back, but I'll try again. Sorry. I don't want to be held responsible either. The appellant established a history of disparate discipline and supervision culminating in selective disciplinary charges brought against him in early 2021 and his ultimate termination, based in part on that history of disparate discipline as well as the disparate treatment of the officer who was present at the scene with him and was not punished in any way for acts which were paramateria to his. Fonsi and Hunter instigated in situations where Caucasian officers were at least equally responsible for violations of departmental policies, no sanctions against them, in situations where my client was also involved, and as explicitly, and the record demonstrates, did not discipline in any manner, let alone any serious manner, individuals who we got some information about with regard to serious, sorry. Which officer, as a comparator, arrested someone without probable cause, deployed a taser in violation of the rules, unconstantly searched the driver, failed to adequately search the driver at the department headquarters for contraband, and then lied about these things? My client did none of those things. I'll just finish the question. Lied about both of these to the investigator and to an independent hearing officer. Which officer did that and was not disciplined? Well, with regard to many of those things, Rerro was present. He was also deemed the arresting officer. It was in his sector. He was not prosecuted in any way for probable cause violation. He was a junior officer, right? Sorry? He was significantly less senior to your client and had no disciplinary history, and he didn't utilize his taser or lie about it, right? Was he finding that he put a taser to someone's head and lied about it? My client didn't put a taser to anyone's head. But the point remains that the evidence shows here that there was probable cause, clearly probable cause, that the finding. An independent officer. You're not alleging the independent officer had any discriminatory intent, right? We're alleging the independent officer was a bought-and-paid-for independent officer who does this repeatedly in Westchester County for jurisdictions. We do have that allegation in the complaint. But regardless of that allegation, those findings are plainly erroneous, and a jury would have an opportunity to hear. There's no res judicata associated with those findings. Those findings came, Your Honor, at a hearing in which the only person who testified substantively was an expert. That expert, if you read his deposition, had absolutely no information about the underlying events. If you read Mr. McCabe's deposition with any degree of care, you will see he didn't know the rules of the department. There was no rule in the department prohibiting my client, with respect to use of the taser, to de-escalate the situation. Roche explicitly states that in his affirmation, as well as the other. You know, the law is, if there's no discriminatory intent from the independent hearing officer, recommends termination based upon all the things that I've read off, and the Board adopts that, you're not alleging, right, that it's adopted. Where's the discriminatory intent? The whole – this whole case is about selectively bringing a charge. So in other words, if you have two individuals who are doing the same types of thing, one of them is not charged that that person is not a minority member, the other is an individual who's a minority member who is not – who is charged, that itself creates the framework for the discrimination. It never should have – I'm sorry. Never should have gotten to the place it got. It only got there because of the whole pattern of discrimination against my client. Moreover, the independent hearing officer, in coming to a conclusion, used the whole history of disparate treatment of my client against my client. I just read his findings this morning. In his findings, he referred only – his entire findings are based upon the 2021 arrest with all the problems and the lying that I just read to you. In the background section, he referred to the history of your client, but as to why he was recommending termination, it was only this arrest. However, the bringing of the charges in the first instance was predicated, according to those who brought it, on my client's repetitive history of doing things like failing to search individuals who were put in a cell when it was not my client. In those instances, it was even the arresting officer. My client sustained punishment for those when the white individuals who were present and who were the arresting officers were never even sanctioned. So he –  Well, why do you think this has a basis in race as opposed to underperformance? There's no underperformance here. We took apart the underperformance arguments entirely, and the record is very clear about that. I'm sorry. Where's the race problem? Ethnicity. National origin issue. He failed to conform to some police idea that if you're an Eastchester, you've got to behave differently than if you're a Yonkers or something. But where does it tie in to any kind of race or ethnic origin? So what occurred, according to the affront we see in Mr. Grotia, who was a sergeant at the time, was that there were repeated references to my clients coming from Yonkers. Being a minority group member from Yonkers, distinguishing – What was his minority group membership? He's Hispanic. As far as Ecuadorian, he's Hispanic. That was never in his earlier filings. It was in the earlier filings, as we point out. The earlier filings, he said there was a failure to conform to stereotypes, that that's what he thought it was. No mention of being Hispanic. You're talking about his filings in the Court. I'm sorry. You're right. You're absolutely right about that. EEOC, E-O-C-O-R. You're right, and that's why I dropped those charges, because it was clear to me that it was inappropriate notice by prior counsel. But when we amended the complaint, we made clear the nature of the discrimination, which was national origin related, and premised on the difference in treatment between him to go to Judge Parker's question on productivity. Just let me finish that answer, if you don't mind. With regard to the productivity issue, there were repeated instances in which my client alone was placed on remedial plans, when the testimony by Grotia or Sargent and others is that my client and the statistical information is my client was as productive as many Caucasian officers who were never placed on any such plan. It's a sui generis kind of treatment of my client. There's no such history. In fact, they made up a form for my client, which they never used for anyone else. And there is no performance issue. If you look at the 2014, 15, 16 performance grades, you don't see it. He was terminated based upon this 2002 arrest. I agree. So that's what you have to address. I did. I'm answering your question. Are you alleging that Lieutenant Joseph Rodriguez investigated it? Are you alleging that he was operating on a discriminatory basis? Absolutely. You are? Absolutely. We're alleging that Joseph Rodriguez was a long – he's not a named defendant, but your question is are we alleging that he's part of this? Absolutely. He's a longtime underling who saw the discrimination visited upon my client repeatedly. My client was being singled out, was not getting promotional opportunities, even though his own sergeants were saying he was promotable and should have gotten those opportunities. That's in writing. When one of the individual sergeants was told to go find – supervise my client, and that individual came back with positive comments about my client, who apprehended a fleeing bank robber, the supervisor, Mr. Hunter and Mr. Bonsi, said to him in a meeting, get rid of that. Get rid of that. We don't want to know that. We just want to know the negatives. When did you allege him? When did that happen? That happened in 2018, that exact event. And what was the statement made again? In substance, find negative things. We're not interested in anything positive. Another individual wrote in a report, Castellano, about my client. Wrote in a report about my client. Where did you allege that Joseph Rodriguez, a discriminatory analyst, you say he's not a defendant. Show me anywhere in your complaint or in your papers that you allege that he, in investigating this arrest, was operating with discriminatory. We have a claim against the town. He is a town official. We didn't name every official. I didn't name every official. That's accurate. But I don't think that gets around the problem. Well, you're saying that they were uneven-handed, put it that way. In every way. Yeah. But I want to know what the protective class was. It seems to be that most you have here is that he got worse treatment than other people, but that doesn't necessarily set forth that he's a member of a protective class or the basis was Hispanic or the basis was whatever, Yonkers or whatever. The district, look, the district court in determining the prima facie case found that he was a member of a protected class. That's not what the case founded on below. I understand you could have an alternative ground, but I believe the forms filled out, the knowledge, and it's all in our brief, the forms filled out initially identify him as Hispanic. Do you think it's back on the McDonnell Douglas test about whether there was legitimate reasons or whether there were pretensions? And I do. You know, there's a strong, there's a strong. Look, there's not a strong. Here's the problem. In every one of the areas where you might want to criticize Mr. Barber, if you look at the record carefully, you will see that there are Caucasian individuals who are involved in the same situation who were treated better than he was. With regard to the cell searches, he was not the arresting officer in the three instances where he's accused and was sanctioned the cell searches, including, by the way, Your Honor, the last instance in 21. He was not the arresting officer. Borrerio was the arresting officer. And it's indisputable that the arresting officer had the responsibility to do the cell search, failed to do it, and was not sanctioned. So the argument that, well, he should have, he didn't have the same record, he's never going to have the same record if he's not sanctioned the first time he does it or given any kind of serious warning or it's even put in his file. All right? What's your evidence that this was based on his ethnicity? The record is the disparate treatment between him and the Caucasians and the fact that it was so clear to Grosha, who was an impartial person. He was a sergeant in the department. You very rarely get this testimony. That they were continuing to go after him. First, let me ask a question. What did he testify to? Grosha gave an affidavit of 1564 of the record, which is in the record, 1564 et al. And you can read the affidavit. Can you remind me what it says? It says that this gentleman was repeatedly the subject of conversation between Grosha and Hunter about his being from Yonkers, which is a surrogate for being a minority group member. That's why they were using that term. How do we know that? Because they were talking about South Yonkers and they were talking about showing him a video of an African-American with baggy pants and a blown train, and the guy says that's how you patrol. There's no allegation that he's an African-American. No, but he's a minority group member. I didn't come up with the idea that he was Hispanic. I didn't come up with the idea. I didn't come up with the idea. It's on the original form he filled out for the department. So I didn't come up with the idea. Earlier on, he was staying away from that. He was saying that he was a surrogate.  His prior lawyer did make arguments that were related to that, but not the same argument. Okay. I'm way over time. Thanks. Okay. Mr. Sokoloff, you're up. May it please the Court. My name is Brian Sokoloff and I represent the appellee defendants here. This is a simple case. It comes to you after the district court found four discreet, adverse job impacts. The district court didn't find, and it's not the basis of this appeal, that putting Mr. Barbarin on remedial training for not speaking properly to members of the public or not patting somebody down correctly, that that's an adverse impact. Well, what do we make of the statement, quote, Yonker's ghetto doesn't add up to my Eastchester professional? And then showing him the video of the black hip-hop artist. What's that all about? So that's about the lieutenant not liking his officers using street vernacular when they make car stops, that they should appear and speak professionally. It has nothing to do with who Mr. Barbarin He said that if that was his, if that was the point he was trying to make. He went out of his, you know, Yonker's ghetto doesn't add up to my Eastchester professionally. It seems to me you have to be pretty naive to overlook the thrust of that comment. And showing someone a movie of a hip-hop artist? I mean, is that your analysis of professional race-neutral behavior in that police department? Well, it might not have been what I would have done. Sure, of course not. But that doesn't turn this whole case and everything that happened to Mr. Barbarin Well, it puts race right in the middle of the case, in my judgment, counsel. But Mr. Barbarin is not black. He's Hispanic. And It puts ethnicity, black and brown people. This is the Eastchester supervisor putting Mr. Barbarin in the category of, you know, inner-city Yonkers folks. Judge, Lieutenant Hunter himself was from Yonkers, as was Chief Bonsey. It's about how Yonkers officers behave on the job. This was not about, and there's nothing else in this whole record How many non-white officers were on the Eastchester Police Department at this point, when he made this comment? I think there was at least one. I don't know exactly the full amount. And out of a force of how many? Probably about 50. Eastchester is basically a white town, right? Yes. But also, they can't just hire anybody. They're constrained. Yeah, they don't want to hire hip-hop types. They don't want to hire people who look like the folks in the video that this supervisor seriously disliked. Judge, that's a little bit unfair. They operate under the civil service law, which means that they're constrained. They can only hire one out of the top three people on a civil service eligible list. They don't control the eligible list. They can't just say, you know, we don't have enough minorities here. Let's hire some more. They have to work on the list. And this isn't a claim about hiring discrimination. It's a claim about treatment. And at most, that 2015 comment — Well, first of all, the one — What do you think Mr. Sussman would say if he got to talk to a jury about these comments? What Mr. Sussman would do is he would — and he's a great lawyer. I've practiced with him. He would try to take the jury's focus off the ball. He would make comments like he said to you that they're claiming that Lieutenant Rodriguez, who did the investigation and wrote the report that led to Barbarin's termination, he said that they're claiming that Lieutenant Rodriguez had an anti-Hispanic bias. I was thumbing through my brief. I couldn't find it, but I know it's in there. In his deposition, Mr. Barbarin himself testified he's not claiming that Lieutenant Rodriguez discriminated against him. It's on page 861 of the joint appendix. Thank you, Judge. So, Lieutenant Rodriguez's response, he was the moving force — In response to Judge Parker's question, even if you could draw some inference from the interaction in 2017, they've offered a nondiscriminatory reason for his termination based on what happened in 2021 that was upheld by a hearing officer and approved by the board and investigated Lieutenant Rodriguez, who they don't claim discrimination against, right? Well, that's exactly right. I mean, I — So what argument could be made about the pretext of the later decision based upon the hearings by his officers or all these things that he did during that arrest that had nothing to do with what happened in 2015? If you look at the hearing officer's very thoughtful decision after the hearing, this is what he said. A police officer who lies in his reports — he found that Barbarin lied in his reports. How did he know that? Because — Well, Mr. Sussman's theory is that this followed a whole year after year of inexplicable discipline against his client, that other officers did things that weren't — that evidenced violation of rules and violation of regulations. Nothing happened to them. Supervisors did stuff that was worse. Nothing happened to them. And then, of course, at the end of the day, if this had happened and if it was based on racial animus, you know, at the end of the day, your client succeeded. They fired him. They got rid of him. That's his theory. And it may not hold up, but it seems — why isn't this something that we're not competent to decide, but a jury should sort all that out? Because this is a classic example of what this Court and others say you can't do. You can't create the logic, I'm Hispanic, they disciplined me, and therefore they disciplined me because I'm Hispanic. I'm Hispanic, and we have a record that — where the supervisor is expressing prejudice against black and brown people. He couldn't be — you know, he said it. A jury might think, well, he's just talking about language. A jury can easily disbelieve that. Judge, this is — all they have, all they have is that one — I don't recall seeing a statement like this before in a Title VII or a discrimination case. Well, that's another thing. All they have. That's another thing. This is not a — You've got the supervisor making that kind of comment. He made — The whole white police department. Judge, there's also the stray remarks doctrine. He made a statement in 2015. That doesn't mean that any discipline that Barbaran gets until 2050 is tainted with that statement. You might make that pitch to a jury, and a jury might believe it, but they may not. But — You get the wrong jurors, you are sunk with — in my opinion, you know, it's been years since I sided at a trial. I remember. I remember both of you. The comparators — What evidence is there that Hunter was involved in this decision? None. In fact, Hunter was retired for a year after Barbaran engaged in lying on a police report, lying to a superior officer, lying under oath to the hearing officer, and — Could the basis be for a rational jury concluding that Hunter's bias in 2015 somehow contributed to the decision of Rodriguez, of the independent officer and the board, to terminate him based upon something that happened to him? Absolutely not. There's no point in empaneling a jury to sit through a trial about that, because if they were to find otherwise, it would be an irrational verdict, and you'd have to set it aside. All right. Thank you. So, unless there are any other questions? There's an interesting focus on Hunter. Bonsi was the police chief. This is what is in the affidavit of the sergeant about Mr. Bonsi, who was there through this. When you talk about Rodriguez, Rodriguez wasn't the chief when this happened. Bonsi was. He's the one who instituted the charges. No one else. Rodriguez specifically stated he did not make any recommendations. That's in his deposition. Mr. Parker, he's referencing, was Bonsi involved in that interaction with your client? That's what I'm — that's what I want to direct your attention to, because I think it's important at 1656 of the record. This is what Mr. Gracia states. I could overhear Bonsi and Hunter discuss Barbarin. I've also had numerous conversations with Hunter about Barbarin and can summarize these as follows. Most of our police officers from Eastchester. Just go slowly. I can't hear you. Most of our police officers were from Eastchester. Anthony Barbarin was raised in South Yonkers. Hunter and Bonsi believed he brought, quote, ghetto to our police department. This is not me. This is the sergeant who had been supervising. He'd been in the department 20 years. He spoke Yonkers, in quotes, a reference to Mr. Barbarin's Hispanic background and the neighborhood he grew up in, which was predominantly comprised of Hispanic persons, quite unlike Eastchester. Hunter would say about Barbarin, keep Yonkers, speak in Yonkers. I'm reading from Gracia's affidavit. The affidavit of the sergeant who was a witness to this and is attesting to what he heard from both Bonsi and from Hunter. Bonsi was running the department. Bonsi's a defendant in this case. And Bonsi's the person who presided over all of the disparate discipline. Now, just one other point, and I'm going to shut up. It's very important that you're reading the affidavit. Can you finish reading the affidavit? Your Honors can obviously look at this, but let me make one other point that's important. The record shows, and this was given to us after great disputation, Mr. Sokoloff objecting and objecting we had no right to it. The records of other white police officers, and please, if you do nothing else, please look at what's in those records as we produce them and summarize them in our brief. When we talk about other white officers, and Your Honor, Judge Parker made this point, the behavior they engaged in was egregious with no response. Sexual behavior towards children in the community. Domestic violence toward their own spouses, which this department knew about and did nothing about. And you're talking about findings, respectfully, Judge Bianco, which are all disputed. The taser issue, which McCabe writes about, he didn't know whether the department had a policy on tasers, and they did not. And the evidence that Gratia presents is that people often use tasers just like my client did to de-escalate situations. Probable cause was never an issue. There were five reasons my client had probable cause in this case. So the independence of all this is subject to question. And a reasonable jury, watching McCabe, the expert on the witness stand, would say he knew nothing about what he testified to. Thank you. Thank you both for your decision. Have a good day.